## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 15-189-1 (RJL)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GILBERTO RIVERA AMARILLAS,** | ) | |
| **also known as "Tio Gil,"** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR CONDITIONS OF RELEASE AND THE GOVERNMENT'S CONTINUED REQUEST FOR DETENTION PENDING TRIAL

The United States of America, by and through the undersigned counsel, respectfully opposes Gilberto Rivera Amarillas's ("Defendant") motion for conditions of release, and the Government respectfully seeks the Defendant's continued detention, as there are no conditions or combination of conditions that would reasonably assure the appearance of the Defendant and the safety of the community. As support thereof, the Government states as follows.

## I.      INTRODUCTION

The Defendant is named in a Superseding Indictment filed on July 26, 2016, which charges the Defendant with seven counts described more fully below. On June 9, 2016, the Defendant was arrested by Guatemalan National Police. Following his arrest, the Defendant was extradited to Washington, D.C. on February 3, 2017. On February 3, 2017, the Government moved for pre-trial detention, which the Court granted. Docket No. 15. On April 6, 2017, the Court designated the case as complex and ordered delays to be excluded from calculations under the Speedy Trial Act.

1

On July 4, 2017, the Defendant moved for pretrial release and proposed a set of conditions that Defendant contends would ensure the safety of the community and the defendant's return to court. Def.'s Motion for Conditions of Release, Docket No. 29 ("Def.'s Motion"). The Defendant's proposed conditions include living in a suburban apartment in Maryland where he would be guarded by private security guards paid for by the Defendant, being fitted with an electronic GPS monitor, and leaving the apartment accompanied by his daughter and a single member of the private security team whenever medical treatment is needed. *Id.* at 2. The Defendant proposes that the security guards each agreed to "not assist" the Defendant in an effort to flee and to "report" violations immediately to the prosecutors or agents. *Id.* Despite these proposed conditions, the Government submits that such conditions would be inadequate to ensure the Defendant's appearance and the safety of the community.  The United States respectfully opposes any request to release the Defendant from detention and requests that this Court order the continued pre-trial detention of the Defendant pursuant to 18 U.S.C. § 3142(e) and § 3142(f)(1) (serious drug offense) and § 3142(f)(2) (risk of flight and/or obstruction of justice). As set forth herein, there is a statutory presumption in favor of detention because the Defendant is charged with controlled substance offenses, each of which carry a maximum penalty of more than ten years imprisonment. Moreover, as detailed below, the Defendant poses an unacceptable flight risk if released from custody and would pose a danger to the community. Accordingly, there are no conditions or combination of conditions that would reasonably assure the appearance of the Defendant and safety of the community as required.

The Defendant is charged in a seven-count Superseding Indictment with Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848 (Count One); Conspiracy to Distribute Five Kilograms or More of Cocaine for Importation into the United States, in violation of 21 U.S.C.

§§ 959(a), 963 (Count Two); Conspiracy to Distribute Five Kilograms or More On Board an Aircraft Registered in the United States, in violation of 21 U.S.C. § 959(b) [as amended, § 959(c)], 963 (Count Three); Distribution of Five Kilograms or More of Cocaine for Importation into the United States, in violation of 21 U.S.C. 959(a) (Count Four); Distribution of Five Kilograms or More of Cocaine on Board an Aircraft Registered in the United States, in violation of 21 U.S.C. § 959(b) [as amended, § 959(c)] (Count Five); Use of a Firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(c)(1)(B)(i) (Count Six); and Importation of Five Kilograms or More of Cocaine and One Kilogram or More of Heroin into the United States, in violation of 21 U.S.C. § 952 (Count Seven). The offense contained in Count One carries a mandatory minimum sentence of life imprisonment. 21 U.S.C. § 848(b). The offenses contained in Counts Two, Three, Four, Five, and Seven contain a mandatory minimum sentence of ten years imprisonment and a maximum penalty of life imprisonment. 21 U.S.C. §§ 960(b)(1)(B). The offense contained in Count Six contains a mandatory minimum enhanced punishment of ten years imprisonment. 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(c)(1)(B)(i).

Accordingly, as there is a statutory presumption in favor of detention where a defendant is charged with an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act and the Controlled Substances Import and Export Act, pre-trial detention of the Defendant is warranted in this case. 21 U.S.C. §§ 3142(e)(3)(A), 3142(f)(1)(C). Additionally, as there is also a statutory presumption in favor of detention where a defendant is charged with an offense under 18 U.S.C. § 924(c), pre-trial detention of the Defendant is further warranted in this case. 21 U.S.C. §§ 3142(e)(3)(B). The Defendant would not be able to rebut the presumption, given the fact that he is a significant risk of flight and obstruction of justice, as explained below.

## II.     FACTUAL BACKGROUND

### A.     The Evidence in this Case Establishes that There are No Conditions that Would Reasonably Assure the Appearance of the Defendant and Safety of the Community and the Defendant Has Failed to Rebut the Statutory Presumption in Favor of Detention

As described in the Government's Motion for Pre-Trial Detention, Docket No. 16, the Superseding Indictment in this case arises from evidence obtained during a multi-year multi-jurisdictional investigation targeting a prolific transnational criminal enterprise (hereinafter, the "enterprise" or "DTO") led by the Defendant Gilberto Rivera Amarillas, and the enterprise's main objective is the procurement and distribution of tonnage quantities of illegal narcotics, predominantly cocaine. The RIVERA AMARILLAS enterprise transports multi-ton quantities of cocaine obtained from South American sources of supply, including Colombia and Venezuela, through Central American transshipment points into Mexico for further distribution to and importation into the United States using land, air and maritime transportation routes. The enterprise partners with other drug trafficking organizations and international criminal organizations to facilitate the movement of narcotics and narcotics proceeds. Under the Defendant's leadership, the enterprise uses corruption payments to public officials to ensure the safe passage of narcotics, to obtain intelligence on rival drug trafficking organizations, to guarantee protection from law enforcement activity, and to maintain control over certain geographic areas, among other reasons.

The Defendant, through the RIVERA AMARILLAS enterprise, has carried out numerous acts of violence, including kidnappings, assaults, acts of torture, and murders. The RIVERA AMARILLAS enterprise engages in these acts of violence for a variety of reasons, including but not limited, to preserve power and control over territory, by keeping victims and rivals in fear of the enterprise; to enforce discipline among associates by punishing disloyalty, failures, and

potential leaks to law enforcement; to enrich associates by ensuring the payment of debts related to the enterprise's criminal activity; and to ensure control over corrupt government officials.

Through a judicially-authorized wiretap investigation intercepting devices used by the Defendant and his co-conspirators, the Government identified the Defendant's role in leading and overseeing the operations of the RIVERA AMARILLAS enterprise, including the transportation of narcotics and narcotics proceeds, the facilitation of corruption payments, and the use of violence, including murder, in furtherance of the enterprise. Based on intercepted communications, information from confidential sources, and other information learned during the course of this investigation, the Government is aware of ten violations of controlled substance offenses, which formed the basis of the Continuing Criminal Enterprise count (Count One) and of the other narcotics trafficking offenses (Counts Two, Three, Four, Five, and Seven).

During the course of this investigation, intercepted communications, physical surveillance, and information from confidential informants has revealed the Defendant's role in the movement of narcotics. For example, intercepts involving the Defendant and his co-conspirators detailed the activities of the RIVERA AMARILLAS enterprise in transporting cocaine on a U.S.-registered aircraft that crashed off the coast of Barranquilla, Colombia on May 20, 2015. On May 11, 2015, intercepted photographs were sent between the Defendant's co-conspirators of a U.S.-registered aircraft that was to be used to transport cocaine from Venezuela to Honduras, and that same aircraft was later used to transport cocaine and crashed off the coast of Barranquilla, Colombia. On May 19, 2015, co-conspirators were intercepted communicating about the timing of the aircraft's departure, and on May 20, 2015, intercepts revealed that the aircraft had not arrived at its destination. On May 20, 2015, the Defendant's son and co-conspirator, identified for the purpose of this unsealed filing as "DEFENDANT'S SON," was

intercepted informing the Defendant of the aircraft's crash stating, "Tell father not to think anything bad. They took down the plane in Colombia. It's already in the news." On the same day, a co-conspirator was intercepted asking for help on behalf of the Defendant and the Defendant's son, stating, "El Tio and Junior want to talk to you to find out what happened. Last night they lost a car with food over here. And they want you to help them to find out what happened." Subsequent intercepts between co-conspirators revealed that the RIVERA AMARILLAS enterprise "had a really bad accident yesterday with one of them," involving an aircraft that "departed from V [Venezuela]. The Colombians screwed them in Barranquilla," and that the enterprise "lost it. The 1600 [kilograms of cocaine]." Colombian authorities recovered 1329 kilograms of cocaine from the aircraft off the coast of Barranquilla, Colombia.

Additionally, this investigation has revealed the enterprise's role in engaging in acts of violence and use of corruption payments in furtherance of the enterprise's drug trafficking activities. As described below, throughout this investigation, intercepted communications, physical surveillance, and information from confidential informants has detailed the Defendant's willingness to engage in acts of violence, including kidnappings, torture, and murder, to ensure control over the RIVERA AMARILLAS enterprise's territory, associates, and corrupt government officials, as well as to punish any potential leaks of information to law enforcement. Furthermore, information learned through intercepted communications and confidential sources also revealed the Defendant's role in engaging in corruption payments to ensure the safe passage of narcotics. For example, after the enterprise successfully transported 1800 kilograms of cocaine to Honduras, intercepted communications provided a cost breakdown for $230,000 in payments related to the aircraft's launch, including payments of numerous bribes to public officials. In an intercept, the Defendant's co-conspirator clarified that he was seeking costs for "PGR Inspectors,

6

[an individual in] DAGC, control tower, and the *feos*," referring to the government inspectors at the airport and in the government's aviation department, Directorate General of Civil Aeronautics, the air traffic controllers, and the Federal Police. Interception revealed that these costs included "$25,000 for the licenses. $50,000 USD for the Federals, $50,000 for the PGR, $25,000 for the airport inspectors. $25,000 USD to the [individual in] the DAGC."

      B.      The Defendant's Medical Condition Did Not Impede the Defendant from Engaging in Drug Trafficking Activities

The Defendant moves for the Defendant's pretrial release on the basis of his "exceedingly poor health," noting that he has "colorectal cancer, which has metastasized to his liver." Def.'s Motion at 1. However, the Government submits that releasing the Defendant from confinement base on his cancer diagnosis and uncertain prognosis will not reasonably assure the appearance of the Defendant and safety of the community. As the defense's review of the Defendant's medical records prior to his arrest indicates, the Defendant was diagnosed with colon cancer at some point prior to February 2015, and by May 2016, the Defendant was believed to have a liver mass indicating metastatic cancer, which is likely a recurrent colon carcinoma. Docket No. 24, Def.'s Opp'n to Gov't Mot. to Indefinitely Suspend the Speedy Trial Act, Ex. 1 [Letter from Dr. Luis Gonzalez]. Despite the Defendant's serious medical condition in May 2016, the Defendant's cancer diagnosis did not impede the Defendant's ability to lead the DTO or engage in narcotics trafficking activities until the time of his June 2016 arrest.

Specifically, in May 2016—weeks prior to the Defendant's June 9, 2016 arrest and in the same time period during which the Defendant's physician found the Defendant to have recurring and metastatic colon cancer with a liver tumor—intercepted communications revealed the Defendant's co-conspirators engaging in drug trafficking activities at the order of the Defendant. For example, on May 24, 2016, DEFENDANT'S SON and a co-conspirator were intercepted

discussing a delayed payment that was being sent from the United States for a prior narcotics shipment, and DEFENDANT'S SON informed the co-conspirator that the Defendant had ordered that the next shipment be sent to the co-conspirator. The co-conspirator informed DEFENDANT'S SON that he was delayed in receiving a money load that was payment owed to the DTO from a prior drug shipment to the United States, but assured DEFENDANT'S SON that he would be able to send the money on the following Wednesday ("Sir I have some bad news. Until Wednesday of the following week the bags will be in Tucson because the problem was that I did not have them. Tomorrow they will be in New Jersey and then they will send it via UPS to Tucson. But it is already confirmed for them sir. That same Wednesday I will take them out quickly sir.") The co-conspirator emphasized that he would make the payments but that he had been nervous that the Defendant would be upset because of the delay in payment. The co-conspirator reassured DEFENDANT'S SON that he would promptly make the payment for the next drug shipment ("I am very worried because I fell behind and maybe Father will get upset. But you will see for the next one I will do it quicker."). After the co-conspirator asked whether he would be permitted to receive another shipment, DEFENDANT'S SON confirmed that the Defendant had ordered the next shipment to be sent ("my father already gave the order to have it sent to you.").

Additionally, on May 25, 2016, DEFENDANT'S SON informed a co-conspirator that he would speak with the Defendant about prices the DTO would be willing to pay for cocaine. DEFENDANT'S SON stated that the Defendant and DEFENDANT'S SON paid $10,500 per kilogram of cocaine in Honduras and $11,500 per kilogram of cocaine at the Guatemala-Mexico border, and refused to pay the requested price of $10,700 per kilogram because he would not make a profit margin ("And well he is now in the H paying 10500. . . . At 115 I am getting it

here at the border so imagine sir. If I pay at 107 it does not turn out."). DEFENDANT'S SON stated that he would ask the Defendant whether he could make the purchase at the requested price ("Sir let me talk with father about the number and I will let you know. Over here there is not much of a margin."). On May 28, 2016, DEFENDANT'S SON complained to another co-conspirator that the Defendant had gotten upset with DEFENDANT'S SON for a delayed drug shipment. DEFENDANT'S SON stated that the Defendant had informed him that a co-conspirator had complained about being kept waiting and that DEFENDANT'S SON justified the delay because he had not received payment yet ("He told me that El Basico told him that I have him here waiting for too long. . . . And I told dad, well, that they want also that we load without money."). DEFENDANT'S SON then complained about the Defendant's temper ("I already told him but when dad gets angry he starts telling you things and to look how his debts are growing but only the bad things. yes, that's one of dad's faults when he gets anxious.").

Earlier in the month, DEFENDANT'S SON informed co-conspirators that decisions related to DTO operations had to be made by the Defendant. For example, on May 13, 2016, DEFENDANT'S SON communicated with a co-conspirator about a pending narcotics shipment, stating that the Defendant wanted the co-conspirator to come meet with the Defendant prior to organizing the shipment ("Let me arrange things with [Redacted] but father wants you to come over here.") After discussing that the DTO associate [Redacted] had been working with another drug trafficker, the co-conspirator responded that the DTO associate would not risk causing any problems with the Defendant ("Well then that has to be thought out, but I don't think that [Redacted] would really want to start trouble with the old man."). On May 16, 2016, a co-conspirator asked DEFENDANT'S SON whether he had a Cessna 421 aircraft, which is a small aircraft commonly used by this DTO and other drug trafficking organizations to move narcotics,

and asked how much the DTO would charge for its use ("Do you still have the 421, Sir? . . . What percentage do you charge?"). DEFENDANT'S SON responded that he needed to speak with the Defendant before confirming its use and price ("Let me speak to my father Sir, because he was doing some negotiations and I don't know if he committed himself."). On May 16, 2016, a co-conspirator asked the DEFENDANT'S SON about how payments would be made to the co-conspirator in Guatemala ("How are you paying me off in guate??"). DEFENDANT'S SON responded that he needed to confirm details with the Defendant ("At 11 Sir. But let me check with my father Sir, to be more certain about the numbers").

     C.     <u>Throughout the Course of the Investigation, the Defendant Has Engaged in Numerous Acts of Violence, including Murder, Torture, and Kidnapping</u>

Furthermore, contrary to Defendant's argument that the Defendant's medical condition and the proposed conditions of release "are more than adequate to 'reasonably assure' his appearance in this case," Def.'s Motion at 2, the evidence in this case demonstrates that the Defendant's medical condition did not stop him from engaging in numerous acts of violence, including against law enforcement officers and suspected witnesses.

Despite the defense's medical summary indicating the Defendant was diagnosed with cancer at some point before February 2015, during that same time frame, the Government's investigation revealed the Defendant's active role in directing and personally participating in numerous violent acts, including kidnappings, assaults, acts of torture, and murders, committed against DTO rivals who engaged in drug trafficking in areas the DTO controlled; disloyal associates who failed to pay drug-related debts or were suspected of leaks to law enforcement; and as retribution to government and law enforcement officials who would not cooperate with the DTO's interests. While the evidence in this case, including substantial information provided by confidential informants and cooperating defendants, has revealed numerous acts of violence

committed by the Defendant, the following sets forth three instances that occurred during the
time frame following the Defendant's cancer diagnosis.

      (1)    <u>February 2015 Attempted Murder of DTO Rival and Retribution Against
Mexican Law Enforcement Officers</u>

In late February 2015 and early March 2015, intercepted communications revealed that
the Defendant had ordered the murder of a DTO rival. Information from cooperating defendants
and confidential informants revealed that the rival drug trafficker was engaging in drug
trafficking in Chiapas, Mexico, which was an area controlled by the Defendant. The
investigation revealed that DEFENDANT'S SON was informed about the location of the rival
drug trafficker but that law enforcement thwarted efforts by the DTO to murder the rival. As a
result, the Defendant directed DTO associates to work with corrupt government official contacts
to obtain hotel surveillance video in an effort to identify the uncooperative law enforcement
officers who had responded to the attack and hindered the Defendant's DTO activities.

Specifically, on February 27, 2015, a co-conspirator sent a photograph to
DEFENDANT'S SON of the potential victim and said, "The waiters are with me, we can poison
him. He will die." Based on a series of intercepted communications about the pending attack,
U.S. law enforcement identified the likely location of the attack, a Hilton Garden Inn in Tuxtla,
Chiapas, Mexico, contacted the hotel, and shared the information with Mexican law enforcement
counterparts who responded to the hotel and thwarted the attack.  Then, on February 28, 2015, a
co-conspirator reported to DEFENDANT'S SON that law enforcement officers had impeded
efforts to kidnap the potential victim ("The government showed up at the hotel last night. I have
people there dude. At 12 last night a group of about 50 men showed up asking for him."). Co-
conspirators also stated that hotel employees had informed them that "gringos" were calling the
hotel. On March 1, 2015, intercepts indicated that the Defendant sought to identify the law

enforcement officers who prevented the attack using the hotel's surveillance video. DEFENDANT'S SON asked a co-conspirator who was located with the Defendant whether to ask a corrupt government official to request the hotel surveillance video. ("We have to have someone ask for the videos from the hotel. We can have them send to the *gob*. Through Roberto tell Papa. We can have them sent to the governor.") The co-conspirator stated that the Defendant agreed. ("Papa says yes and to just get him the videos. So they can give it to us with someone they know.") Intercepts further clarified that the purpose of identifying the officers who responded was to ensure retribution. ("But we have to see the ones from security. So everyone can be fired.")

(2)   March 2015 Kidnapping, Torture, and Murder of Suspected Leak

Over the next two days, the Defendant directed and personally participated in the kidnapping, torture, and murder of individuals who were suspected of leaking information to law enforcement that had led to the thwarted attack on the DTO rival at the Hilton Garden Inn. The Government submits that the torture of these individuals was also designed to obtain additional information about other law enforcement officers who may have been involved in the operation and was intended to punish law enforcement officers who were disloyal to the Defendant and hindered his DTO operations. Specifically, on March 2, 2015, DEFENDANT'S SON received a photograph of an individual's military identification card, and DEFENDANT'S SON subsequently provided flight information for that individual and directed that individual to be kidnapped, tortured, and interrogated to determine whether the individual had leaked information to law enforcement. ("Have them grab him there in the airport. He and another guy are coming. There are 2 with him. So they can investigate them. A thorough check of everything. To see if that guy isn't working with the DEA.") U.S. and Mexican law enforcement were unsuccessful at preventing the kidnapping.

12

On March 3, 2015, a co-conspirator informed DEFENDANT'S SON that the murder had

been completed and sent a photograph of a fire. ("It is done. We just need to disappear.")



DEFENDANT'S SON asked the co-conspirator what the victims had reported ("What did you

get out of the friends?"), and the co-conspirator stated that the Defendant had gotten angry that

the victims did not provide information, which led the Defendant to have them killed. ("Nothing

man. He no longer wanted to speak with them. They refused and pap would get more upset. Papa

confirms and said it was okay to finish with the rats.")

That same day, the Defendant was intercepted asking DEFENDANT'S SON which

vehicles could be destroyed in order to conceal the evidence from the murder. ("What's up, son,

how are you doing today. I think that we are going to need cars, to be able to take all the garbage.

What cars do you have that will be good for us to use.") DEFENDANT'S SON responded that

he would provide a Jeep Cherokee, and the Defendant asked DEFENDANT'S SON to confirm

that any identifying features of the car would need to be removed and have the car brought to

him. ("That one isn't under anybody's name. Have a driver to take it, and we'll talk about it in a

little while.") DEFENDANT'S SON agreed. ("Ok, dad you let me know.") DEFENDANT'S

SON immediately thereafter directed a co-conspirator to remove all identifying paperwork from

the Jeep Cherokee, noting that any evidence of the victims of prior day's kidnapping, torture, and

murder would be destroyed using that vehicle. ("Take out all the papers from the cheroke. That isn't anything that belong to us there. That they are going to take the ones that arrived in that one.")

(3)     August 2015 Murder of Rival Drug Trafficker

In August 2015, intercepted communications revealed that the Defendant had directed DTO associates to kidnap, torture, interrogate, and murder an individual who had been working in drug trafficking for another DTO in an area controlled by the Defendant, without the permission of the Defendant. After a co-conspirator asked DEFENDANT'S SON to inform the Defendant that the co-conspirator had located the victim, the co-conspirator then sent a photograph of a bloody victim, illustrating the torturous acts that had been committed. The co-conspirator reported that the victim had given up names of ten other individuals who were working in the Defendant's region, including some in Comitan, Chiapas, Mexico, which is an area controlled by the Defendant. The co-conspirator subsequently sent a second photograph of an individual in a barrel that was lit on fire. The Government submits that the Defendant directed that this murder victim be kidnapped, interrogated, and killed as retribution for working for another DTO and to send a message to other DTO associates not to engage in similar disloyalty, as well as to send a message to rival DTOs not to encroach on the Defendant's territory. Specifically, on August 17, 2015, a co-conspirator informed DEFENDANT'S SON, "Listen, tell your dad we already located the person who stole from your dad's friend. Hahaha." The co-conspirator then sent the below photograph:



The co-conspirator then provided DEFENDANT'S SON with information about the victim.

("Someone from over here who was stealing work. A first class thief. He gave names of about

ten people who are stealing. Even from Comitan. They want to do away with one guy who works

with your father. I have the videos and everything here.") Subsequently, the co-conspirator sent

the below photograph:



      D.     <u>During the Course of this Prosecution, the Government Has Produced Discovery to Defendant Under the Court's Protective Order, and the Release of the Defendant Would Risk Disclosure of this Sensitive Information and Compromise the Safety of Confidential Sources, Cooperating Defendants and Foreign Law Enforcement Officers</u>

On February 13, 2017, the Court issued a Protective Order that applied to certain

sensitive discovery produced in this case to the Defendant. Docket No. 23. While the Protective

Order required the Defendant to sign an acknowledgement form, affirming that the Defendant

understood the terms and consequences of violating the protective order, if the Defendant were

released from detention and were to abscond and return to Mexico, the Government would be unable to ensure the information is not further disclosed. This would cause significant risks to the safety of witnesses and jeopardize ongoing law enforcement operations.

The sensitive material subject to the Court's Protective Order contains significant information about confidential sources and cooperating defendants who have provided information to U.S. law enforcement related to the Defendant, his co-defendants, and his co-conspirators.  The protected discovery also contained information related to foreign law enforcement who have engaged in law enforcement activities outside of the United States involving the DTO and shared this information with the Government. The sensitive material that was disclosed to the Defense also contains the means, methods, and tools used by law enforcement when investigating drug trafficking activities outside of the United States and the specific tools used in investigating the Defendant and his co-conspirators. Disclosure of this information would create a significant risk to the safety of cooperating defendants and confidential sources, some of whom are currently engaged in ongoing operations. Disclosure of this sensitive information provided by foreign countries could also jeopardize the safety of the foreign law enforcement officers working in those countries. Additionally, revealing information about the methods used by U.S. law enforcement to investigate the Defendant who would be returning home and could share this information with unindicted and indicted co-conspirators would substantially impact ongoing investigations and disrupt efforts to locate and arrest fugitive co-defendants.

While the evidence discussed *supra Section II-B, II-C* provides a sufficient basis for the Government's concerns regarding the injurious effect of releasing the Defendant, in *Mays v.*

*Drug Enforcement Administration*, 234 F.3d 1324 (D.C. Cir. 2000), then-Judge Ginsburg

discussed the violent nature of the cocaine trafficking industry:

> This court knows all too well the violence and danger that accompany the cocaine trade. Indeed, for the same reasons that an informant would justifiably fear reprisal from a murderous street gang and expect the authorities to keep his information confidential, *so too would an informant reasonably fear reprisal by conspirators to distribute cocaine; the two types of criminal enterprises are closely comparable in terms of their organization and their penchant for violence.* See U.S. SENTENCING COMMISSION, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 4 (1997) (trafficking in crack cocaine closely associated with " systemic crime ... particularly the type of violent street crime so often connected with gangs, guns, serious injury, and death"); U.S. SENTENCING COMMISSION, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 95-98 (1995) (chronicles empirics of violent crime, including " elimination of informers," that attends trafficking in crack and powder cocaine).

> Indeed, our notion of what is reasonable police conduct has long reflected the heightened danger and risk of violence posed by cocaine trafficking. Surely we must extend the same consideration to informants when they help a law enforcement agency combat this type of crime. *To expose them to the real potential of retaliation at the hands of cocaine traffickers would be not only incongruous but also perverse.*

> [Appellant] protests that the presumption urged by the Government is too broad, that it would cloak in confidentiality anything anyone ever tells a law enforcement officer about any drug crime. Not so: *We speak here only of those informants who supply intelligence relating to the crime of conspiracy to distribute cocaine; the accumulated evidence and experience of this court bear most forcefully upon that specific offense.*

*Mays v. Drug Enforcement Administration*, 234 F.3d at 1329-30 (emphasis added and internal

citations omitted). Based on the violent nature of the drug trafficking organization, the Government

requested the protective order in this case, which the Court granted.  *See, e.g.*, *United States v.*

*Celis*, 608 F.3d 818, 825 (D.C. Cir. 2010) ("Because appellants' actions were tied to a terrorizing

drug trafficking organization in Colombia, the district court issued a protective order to ensure the

safety of certain government witnesses.").

As detailed previously, this investigation has revealed the Defendant's and his co-conspirators' willingness to kidnap, torture, and murder any individuals who are suspected of disloyalty to the DTO's interest, particularly those who leak information about DTO activities to law enforcement. If the Defendant were released pending trial and able to abscond to Mexico, it is almost a certainty that the Defendant and his co-conspirators would engage in retributive acts on any individuals who are suspected of aiding the Government in its investigation of the Defendant and his co-conspirators.

Furthermore, given the Defendant's medical condition, if the Defendant believed that he had only weeks or months to live with nothing to lose, the Government envisions a scenario where the Defendant absconds to Mexico to direct or personally engage in acts of violence against his enemies, including foreign law enforcement officers, suspected confidential sources, family members of suspected cooperating defendants, and other DTO rivals. The Government cannot predict whether such a situation would occur but submits that the risks resulting from the Defendant's pre-trial release are far too great.

## III.   LEGAL ANALYSIS

### A.   Statutory Presumption

The presumption of detention under 18 U.S.C. § 3142(e)(3)(A) and § 3142(e)(3)(B) applies in this case. Under this provision, there is a statutory rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required if the judicial officer finds that there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.) or the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.) or that the defendant committed and

offense under 18 U.S.C. § 924(c). The Defendant is charged with offenses under the Controlled

Substances Act and the Controlled Substances Import and Export Act. As a result of the drug

quantity alleged in this case, that is, multi-ton quantities of cocaine, the Defendant faces a

maximum term of life imprisonment, which is ten years or more. *See* 21 U.S.C. §§ 848(b),

960(b)(1)(B). An indictment charging a qualifying offense, as is the case here, is sufficient to

trigger this rebuttable presumption. *United States v. Smith*. 79 F.3d 1208 (D.C. Cir. 1996);

*United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986). When the presumption is

triggered, it operates "at a minimum to impose a burden of production on the defendant to offer

some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768

F.2d 364, 371 (D.C. Cir. 1985). Several other factors in the detention statute, including the nature

and circumstances of the offense, the characteristics of the Defendant, and his significant risk of

flight and obstruction of justice, also support the Government's request for pretrial detention.

B.      Nature and Circumstances of Offense Charged

The Defendant was a leader of a transnational criminal enterprise operating out of

Mexico that conspired to distribute multi-ton quantities of cocaine, a Schedule II controlled

substance, on U.S. registered aircraft and for further distribution to and importation into the

United States using land, air and maritime transportation methods. The international scope of the

conspiracy and its members, the quantity of cocaine involved, the methods of transport, and acts

of corruption and violence, including murder, reflect the seriousness of the offenses charged and

therefore weigh heavily in favor of detention. See 18 U.S.C. § 3142(g)(1).

C.      Weight of the Evidence

As described in the foregoing factual proffer, the evidence against the Defendant

includes, but is not limited to, extensive judicially authorized intercepted communications, the

testimony of multiple confidential sources and cooperating witnesses, testimony from law

enforcement agents, physical surveillance and videos of narcotics movements, and drug evidence

related to seizures. The strength of the evidence, including the Defendant's own intercepted

communications, weighs heavily in favor of detention. *See* 18 U.S.C. § 3142(g)(2).

      D.      <ins>History and Characteristics of the Defendant</ins>

The Defendant is a citizen of Mexico who was residing in Mexico at the time of his

activities. He was arrested while traveling in Guatemala. The Defendant has a criminal history

involving multiple prior arrests and at least one conviction, and the Defendant was removed to

Mexico in 2001. The Defendant has no legal status in the United States and no known ties to this

federal district. The Defendant has been paroled into the United States by virtue of his

extradition to the United States from Guatemala and solely for the purpose of facing prosecution

on the identified charges. Moreover, the Government has requested that Immigration and

Customs Enforcement ("ICE") lodge a detainer against the Defendant. Because of the

Defendant's contacts overseas, any removal or flight from the United States would most

assuredly result in the United States' inability to ever obtain custody of this Defendant again.

The history and characteristics of the Defendant weigh heavily in favor of detention. *See* 18

U.S.C. § 3142(g)(3).

      E.      <ins>Risk of Flight</ins>

A determination of risk of flight must be supported by a preponderance of the evidence.

*United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). The Government submits that the

Defendant is a serious flight risk, and due to the seriousness of the crimes charged and his lack of

ties to the community, he would attempt to leave the United States if given the opportunity. The

Defendant's appearance in the United States is a result of a lengthy extradition process between

the United States and Guatemala. He has no known lawful contacts to or in this federal district

and no reason to remain in this country. Furthermore, as stated above, the Defendant was paroled

into the United States solely for prosecution in the instant case. Even if he were released, he

would be subject to the ICE detainer. Additionally, courts have recognized that "the 'lucrative

nature of drug trafficking, and the fact that drug traffickers often have established substantial ties

outside the United States' indicates a high risk of flight." *United States v. Bell*, 209 F. Supp. 3d

275, 278 (D.D.C. 2016) (quoting *United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir.

1985)). In short, the Government submits that the Defendant would abscond were he released as

he has no reason to remain in this country or any ties to this country, and he therefore represents

an overwhelming risk of flight if released from custody.

      F.    <u>Risk of Obstruction of Justice and Safety of the Community</u>

A defendant must be detained if there is clear and convincing evidence that no conditions

placed upon his release would reasonably assure the safety of community. *United States v. Smith*,

79 F.3d 1208, 1209 (D.C. Cir. 1996) (per curiam). In evaluating whether a defendant's release

would endanger the community, court should consider "the nature and circumstances of the

offense charged, including whether the offense is a crime of violence. . . or involves . . . a

controlled substance [or] firearm." 18 U.S.C. § 3142(g)(1). Courts are also to consider "the

nature and seriousness of the danger to any person of the community that would be posed by the

person's release." 18 U.S.C. § 3142(g)(4). "If the court finds probable cause to believe that the

defendant committed a drug offense for which a maximum penalty of ten years imprisonment or

more is prescribed, the court must presume, subject to rebuttal by the defendant, that no

combination of conditions upon the defendant's release would reasonably assure the safety of the

community and the appearance of the defendant as required." *Smith*, 79 F.3d at 1209.

Here, the Defendant cannot rebut the presumption that detention is needed to assure the safety of the community. As discussed earlier, throughout the course of this investigation, information learned through intercepted communications and confidential informants has revealed the Defendant's willingness to engage in acts of violence, including murder, targeted at law enforcement and potential witnesses against the Defendant. On multiple occasions throughout this investigation, agents have developed information regarding specific threats to the safety of the community from the Defendant and his associates. The Defendant contends that his proposed conditions of pretrial release "would allow him to live whatever time he has remaining with some semblance of human dignity," Def.'s Motion at 2, however as discussed *supra Section II-C*, the Defendant's cancer diagnosis and poor medical prognosis did not previously stop the Defendant from personally engaging in and directing numerous acts of violence, including torture and murder, regardless of his desire for human dignity.  The Government submits that no combination of conditions upon the Defendant's release would reasonably assure the appearance of the Defendant and the safety of the community if the Defendant were released.

WHEREFORE, for the foregoing reasons, the Government opposes the Defendant's motion for conditions of release of the Defendant and submits that the Defendant should continue to be detained pending trial.

Respectfully submitted,

Arthur G. Wyatt, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:     _____*Adrienne Rose*_____
Adrienne Rose
Emily Cohen
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
Washington, D.C. 20530
 (202) 532-4779

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the Defendant, this 5th day of July 2017.

_Adrienne Rose_

Adrienne Rose
Emily Cohen
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice